UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

BRIAN GREGORY,

       Plaintiff,

    v.

FED EX NATIONAL LTL, INC., n/k/a Fedex
Freight, Inc., and DANIEL ADAM DAVIS,

       Defendants.

Case No. 14-cv-572-JPG-RJD

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

The Court held a bench trial in this negligence case in Benton, Illinois, on June 28, 2016.

Plaintiff Brian Gregory appeared *pro se*, assisted by stand-by counsel Eric W. Kirkpatrick.

Defendants Fed Ex National LTL, Inc., now known as Fedex Freight, Inc. ("Fedex") and Daniel

Adam Davis were represented by Steven J. Hughes.   Gregory called himself and the defendants

called Davis as live witnesses.   They further jointly presented the deposition testimony of

witnesses Dr. Don A. Kovalsky, Dr. Chelsea Crisp and Dr. Keith D. Wilkey.[1]

**I.    Background**

Gregory brought this case after he was injured in a December 29, 2009, traffic collision

in Mt. Vernon, Illinois, with a Fedex tractor-trailer rig driven by Davis, who was employed by

Fedex at the time.   Gregory alleges Davis was negligent (Count II) and that Fedex is vicariously

liable for Davis's negligence (Count I); the defendants claim Gregory's own negligence caused

his injuries and challenges the extent of his injuries from the accident.

Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following

relevant findings of fact and conclusions of law.

---

[1]  In light of Gregory's *pro se* status, the defendants' counsel graciously cooperated in providing
to the Court all of the expert depositions needed by both sides in this case.

II.     **Findings of Fact**

The Court finds the following facts by a preponderance of the evidence:

A.      <u>The Collision</u>

1.  On December 29, 2009, Davis, a Fedex employee was driving a Fedex tractor-trailer rig in Mt. Vernon, Illinois, in the course of his employment.    The tractor was hauling two "pup trailers" connected by a dolly.    The whole rig was about 58 to 60 feet in length.

2.  At the same time, Gregory was driving a pick-up truck that was hauling a goose-neck trailer.    At all relevant times, Gregory was wearing a functioning seatbelt with a lap and shoulder belt.

3.  Gregory worked in his family's logging business doing hard physical labor.

4.  The area of the intersection where the collision took place is reflected on this map, of which the Court takes judicial notice for the sole purpose of assisting the reader in understanding the events described in the testimony:



5. Broadway Street is a four-lane road with a center turn lane running in the east-west direction.

6. To the extent Gregory's and Davis's descriptions of the accident differ, those differences are immaterial to the outcome of this trial except where noted in this order.

7. At around 9:30 a.m. on December 29, 2009, Davis was attempting to exit the premises of a TA truck stop located on the north side of Broadway Street.   Davis was heading south out of the truck stop with the intention of turning left onto eastbound Broadway Street. Davis's point of entry onto Broadway Street was not controlled by a traffic signal.

8. Davis's point of entry was about 250 feet west of the intersection of Broadway Street and the Wells Bypass (also referred to on the above map as S. 45th St.) (the "Wells Bypass intersection"), which was controlled by a traffic signal.

9. At the time Davis was stopped at the exit of the truck stop, he was not wearing headphones, was wearing glasses, and was intently looking for an opportunity to exit the truck stop safely.   There was moderate to heavy traffic on Broadway Street at the time, making it difficult for Davis to identify an appropriate time, and he waited several minutes for an opportunity to arise.

10. While Davis was waiting for traffic to slow so he could safely exit the truck stop, Gregory was heading northbound on the Wells Bypass and was the second vehicle stopped at a red light in the left turn lane at the Wells Bypass intersection.

11. Davis continued to look left and right in an attempt to identify a safe time to enter onto Broadway Street, and in doing so saw Gregory and others waiting in the Wells Bypass left turn lane.

12. Davis saw that the traffic light at the Wells Bypass intersection had turned red for the westbound traffic on Broadway Street and knew that the left-turning lane from the Wells Bypass, where Gregory was, would soon have a green left turn arrow.   Davis thought the stopped westbound traffic would be his best opportunity to exit the truck stop and that he could clear the intersection before the traffic turning west from the Wells Bypass reached him, so he moved into the intersection.   Although Davis thought this was his best opportunity to exit the truck stop, it was not safe.

13. In the meantime, when the traffic light at the Wells Bypass intersection turned red for the westbound traffic on Broadway Street, it turned green for the northbound, west-turning traffic from the Wells Bypass, the line of traffic in which Gregory was waiting.

14. Gregory and the vehicle in front of him made the left turn onto westbound Broadway Street into the right, northernmost of the two westbound lanes of traffic.

15. Gregory had not had time to build up excessive speed because he had started from a stop, was hauling a trailer, and had a slow-moving vehicle in front of him.

16. Shortly after making the turn, Gregory switched to the left, southernmost of the two westbound lanes to avoid the slowing vehicle in front of him.   As Gregory approached Davis's point of entry onto Broadway Street in the left, southernmost of the two westbound lanes, Davis had not yet cleared the westbound lanes, and the first trailer Davis was hauling was blocking the lane in which Gregory was driving.   Gregory applied his brakes as soon as he saw Davis's rig in an effort to avoid impact with the trailer.

17. Gregory collided with the first trailer Davis was hauling toward the back half of the

4

trailer.    The impact smashed the front of Gregory's truck behind the "landing gear" of

the trailer, the equipment that allows the trailer to rest on the ground when not attached to

a tractor.    Gregory's truck was stuck under the trailer upon impact.    Gregory's

testimony that there were multiple impacts between the trailer and his truck and that

Davis continued driving after the impact was not credible in light of Gregory's demeanor

while testifying, the credible contrary testimony given by Davis, and the pictures of

Gregory's truck following the accident, which do not reveal damage that would be

expected from the kind of accident Gregory described.

18. Davis felt the impact from the collision and stopped the tractor-trailer as quickly as

possible.    He remained stopped until the police arrived.

19. The events that occurred as a consequence of the collision are disputed.    Gregory

testified that during the accident, he slipped under the seatbelt and went to the floor board

six or seven times; was caught in the steering wheel; hit his head several times on the

pole beside the driver's seat, on the steering wheel and heater core; and ended up with the

gear shift in his mouth.    The Court finds this testimony incredible in light of the fact that

Gregory was wearing his seatbelt at the time and is of substantial size, and the events

Gregory describes appear to be physically impossible while he was restrained by a

seatbelt.    Additionally, Gregory testified he hit his head several times in the accident so

he "really wasn't thinking right" and that he was under duress from having his truck

stuck under Davis's trailer, which calls into question his memory of the events.

Furthermore, the elaborate sequence of events could not have occurred in the brief time

period between the collision and when Gregory got out of his vehicle.    The Court also

considers Gregory's demeanor while testifying as well as internal inconsistencies in his testimony and finds that his testimony as to these matters was not convincing.

20. After the collision, Davis and Gregory got out of their respective vehicles and waited for the police to arrive on the scene.   While waiting, Gregory walked around to look at his vehicle and the collision area.

21. About five to ten minutes after the accident, first responders reported to the scene.

22. Davis was issued a traffic citation for failing to yield the right of way when exiting a private road or drive.

23. Medical first responders put a neck brace on Gregory, but Gregory refused to be transported to the emergency room of a local hospital because he said he thought was okay.

   B.   Gregory's Injuries and Medical Care

24. Following the accident, Gregory sought treatment primarily from chiropractor Dr. Chelsea Crisp at the Fairfield Chiropractic Clinic and orthopedic spine surgeon Dr. Don A. Kovalsky at the Orthopedic Center of Southern Illinois.   He was also examined at the defendants' request by orthopedic spine surgeon Dr. Keith D. Wilkey.

25. Gregory suffered some serious injuries from the accident, but his testimony about the nature and extent of his injuries was not entirely credible.   The Court bases this conclusion on Gregory's demeanor while testifying, his conduct in delaying seeking medical treatment or missing appointments that is not consistent with the serious extent of the injuries he claims to have suffered, the inconsistency of his complaints with the medical records and his deposition testimony, medical professionals' observations that

the objective evidence of Gregory's injuries was not completely consistent with his

complaints, and Gregory's ability to work at least part-time and participate in other

demanding physical activities after the accident until at least 2014.

26. Gregory had pre-existing medical conditions, including degenerative disc disease and an

extra rib.

27. In 2006, Gregory had a work-related injury to his left hip when he fell on a log, causing

left buttock pain radiating into his left thigh and down his leg.   He received treatment

for his lower back and hip at that time.

28. After the 2009 accident at issue in this case, Gregory continued his work cutting timber

for his family's logging business, although he was hurt and had difficulty using his

shoulder and arm.   He worked a physically demanding job on and off for the timber

cutting business from 2010 to at least 2014.   At the time of trial, he was only working

part-time.

29. Since the accident, Gregory has gone raccoon hunting at least ten times each season and

has participated in fifteen to sixteen raccoon hunting competitions and other competitions

with his dog.   In some competitions, he rode a horse.

30. Gregory first sought medical care on January 7, 2010, nine days after the accident, when

he visited Dr. Crisp.[2]   At that visit, Gregory complained of pain in his head, neck

(cervical spine), left shoulder and left arm.   He did not complain of middle (thoracic) or

lower (lumbar) back pain, leg pain or rib pain and did not inform Dr. Crisp of the prior

injury to his left hip and leg.

31. As treatment progressed, Dr. Crisp observed Gregory improving, so she released him to

---

[2] At the time of Gregory's treatments, Dr. Crisp's last name was Page, which appears in the exhibits.

resume full-time work in the timber cutting business on February 12, 2010.

32. Gregory began complaining of pain down his left leg to his left calf on February 15, 2010, after he began working more.

33. In late March 2010, Gregory saw Dr. Elizabeth Sweet-Friend, a medical doctor with Southern Illinois Primary Care Associates, for back pain.

34. On March 30, 2010, Dr. Crisp diagnosed Gregory with sprain/strain to the cervical spine from whiplash, pain in the cervical spine radiating into left shoulder and arm, and pain in the left calf.

35. Gregory made consistent progress in the treatment of the injuries to his head, neck, left shoulder and left arm.

36. On March 31, 2010, Gregory first complained of pain in his middle spine and ribs.

37. On April 8, 2010, Gregory first complained of low back pain after doing more work and lifting at his farm, and on July 23, 2010, Dr. Crisp added to her previous diagnosis sprain/strain to the lumbar spine and pain in the thoracic spine.   Gregory told Dr. Crisp that he remembered hearing his low back pop in the accident but that it had just started to bother him.

38. Dr. Crisp treated Gregory for all his complaints until March 3, 2011.   At that point, there were no positive orthopedic tests, but Gregory still complained of pain.

39. During the course of her treatment of Gregory, Dr. Crisp formed the impression that Gregory was not truthful all of the time regarding his subjective complaints, which sometimes did not match up with her objective findings and which should have been resolved after more than a year of treatment.

8

40. Gregory also sought treatment from Dr. Kovalsky for back, neck and rib pain beginning around December 3, 2010, and continuing until at least July 1, 2015.   Dr. Kovalsky determined Gregory had age appropriate minor degenerative spine changes, thoracolumbar contusion, possible rib injury, and left lumbar radiculopathy caused by a lower back disc herniation, but no bone fractures.   The lower back disc herniation was the cause of Gregory's lower back and leg pain.   Gregory did not complain of significant shoulder pain at his first visit with Dr. Kovalsky.

41. Dr. Kovalsky began treating Gregory's neck pain on March 3, 2011.   He diagnosed Gregory with whiplash syndrome with a mild left cervical radiculopathy.   The vast majority of those suffering from whiplash syndrome heal within fourteen months of the injury, but Gregory is one of the few who continue to have pain beyond that time period. Surgery is not required or recommended for Gregory's whiplash syndrome.

42. Gregory first complained to Dr. Kovalsky about shoulder pain in February 2012, more than two years after the accident.

43. In 2013, tests Dr. Kovalsky ordered because Gregory complained of middle back pain showed no injuries to or significant degeneration of Gregory's ribs or spine and were unremarkable.

44. Dr. Wilkey, an orthopedic spine surgeon, reviewed Gregory's medical records and performed a medical exam on Gregory on February 2, 2016, for purposes of this litigation.

45. Dr. Wilkey noted that Gregory's complaints did not match any known findings or patterns of illness he could identify, that Gregory exaggerated his responses to his

physiological injuries, and that he was not a reliable historian of his injuries.

46. When Dr. Wilkey examined Gregory, his objective examination results of his lumbar spine were essentially normal with exaggerated subjective complaints.   Dr. Wilkey further observed that Gregory was able to stand in a way that indicated his back pain was minimally bothersome.

47. Dr. Wilkey testified that that Gregory suffered no injury from the accident that required surgery.

48. The sprain/strain to Gregory's cervical spine from whiplash and pain in the cervical spine radiating into left shoulder and arm as diagnosed by Dr. Crisp were caused by the accident.

49. Gregory's disc degeneration in his cervical spine was not caused by the accident.

50. Gregory's lower back disc herniation was not caused or aggravated by the accident. Although Dr. Crisp testified that she believed his middle and lower back problems were caused by the accident, she admitted it was unusual for such problems to surface so long after the accident.   According to Dr. Kovalsky and Dr. Wilkey, if caused by the accident, a lower back injury would have caused lower back pain sooner than it did after the accident.   Additionally, according to Dr. Wilkey, the pain would have begun in the back and then spread down his leg, which is not how Gregory experienced his pain.   Dr. Wilkey testified there was no evidence to support a causal relationship between Gregory's back complaints and the accident based on the timing of Gregory's complaints in relation to the accident.   Dr. Kovalsky and Dr. Wilkey testified there is insufficient evidence to conclude that Gregory's low back disc herniation was a result of the accident.

51. Gregory's report of hearing a pop in his lower back at the time of the accident is not credible.   As explained above, his memory about the events he experienced during the accident is not reliable, and medical records do not reflect he reported this event to Dr. Crisp when he first visited her.

52. Gregory's pain in the left calf as diagnosed by Dr. Crisp was not caused by the accident. The pain in the left calf was caused by a lower back disc herniation which, as explained above, was not caused or aggravated by the accident.   Dr. Crisp's testimony that the calf pain was caused by the accident is not persuasive in light of the contradictory expert testimony from orthopedic specialists and the questionable timing of the pain, discussed above.

53. Gregory has not established that his shoulder pain that began in February 2012 was caused by the accident.   It was more likely caused by degenerative or arthritic changes in Gregory's shoulder over a period of ten years or more.

54. There was no injury to Gregory's middle back from the accident.

55. The cost of services from Dr. Crisp relating to injuries caused by the accident was $3,500.   Because Dr. Crisp was treating multiple problems at the same visit, some of which were caused by the accident and some of which were not, it is difficult to separate the costs relating to injuries caused by the accident from the costs relating to other complaints.   The Court reduces Dr. Crisp's total charges of $4,712 by approximately 25% to $3,500 to account for her treatment of injuries not caused by the accident.

56. The cost of radiology interpretation services from Richland Radiology relating to the accident was $600.   All charges are considered, including charges related to the middle

and lower spine, because all tests were necessary to assist in the determination whether injuries were caused by the accident.

57. The cost of x-ray services from Fairfield Memorial Hospital relating to the accident was $2,385.   All charges within the few months immediately following the accident are considered, including charges related to the middle and lower spine, because all tests were necessary to assist in the determination whether injuries were caused by the accident.

58. The cost of services from Dr. Sweet-Friend for investigation of injuries that might have been caused by the accident was $366.

59. The cost of services from the Orthopedic Center of Southern Illinois for injuries caused by the accident was $24,149.   Because Dr. Kovalsky was treating multiple problems at the same visit, it is difficult to separate the costs relating to injuries caused by the accident from the costs relating to other problems.   The Court reduces the total charges of $27,370 for services related to Gregory's neck by approximately 10% to $24,149 to account for treatment of other problems not caused by the accident.

60. Gregory experienced pain and suffering caused by the accident.   Fair compensation for that injury is $30,000.

61. Gregory will continue to experience pain and suffering caused by whiplash from the accident.   Fair compensation for that future injury is $4,000.

62. There is insufficient evidence to find that other medical bills submitted into evidence were for injuries related to the accident.

63. There is no evidence of lost wages.

12

### III.     Conclusions of Law

The Court has removal subject matter jurisdiction over this cases pursuant to 28 U.S.C.

§ 1441(a) based on the Court's original diversity jurisdiction under 28 U.S.C. § 1332(a).

Gregory brings state law claims for negligence, and the defendants argue Gregory was

contributorily negligent.

The Court is exercising diversity jurisdiction in this case, so it applies Illinois substantive

law to the dispute.    Under Illinois law, to prove a defendant was negligent, the plaintiff must

prove by a preponderance of the evidence "the existence of a legal duty owed by the defendant to

the plaintiff; breach of that duty; a resulting compensable injury to the plaintiff; and that the

breach was the proximate cause of the injury."   *Brobbey v. Enterprise Leasing Co. of Chi.*, 935

N.E.2d 1084, 1093 (Ill. App. Ct. 2010).

A.     <u>Standard of Care and Breach</u>:    Illinois common law and the Illinois Vehicle

Code provide the standard of care.    The common law duty is the duty of ordinary care.    Davis,

individually and as agent of Fedex, owed Gregory the common law duties to refrain from

entering Broadway Street without first determining it was safe to do so and to yield the right of

way to traffic on Broadway Street, including the vehicle driven by plaintiff.    Davis also owed

the following duty to Gregory under the Illinois Vehicle Code:

> **5/11-906. Vehicle entering highway from private road or driveway**
> § 11-906. Vehicle entering highway from private road or driveway.    The driver
> of a vehicle about to enter or cross a highway from an alley, building, private road
> or driveway shall yield the right-of-way to all vehicles approaching on the
> highway to be entered.

625 ILCS 5/11-906.    This statute requires yielding the right of way to vehicles "approaching so

closely on the roadway as to constitute an immediate hazard."    *Salo v. Singhurse*, 537 N.E.2d

339, 340 (Ill. App. Ct. 1989) (considering similar provision of Illinois Vehicle Code regarding rights of way at intersections).

Davis, individually and as agent of Fedex, breached those duties when he entered Broadway Street from the TA truck stop without first identifying a gap in traffic where he could *clear* the westbound lanes before the imminently approaching westbound traffic, whether from Broadway Street or the Wells Bypass, reached him.   That traffic posed an immediate hazard. Davis stated he waited for what he believed was the "best" opportunity he had to enter Broadway Street, but the "best" opportunity was not sufficient.   A reasonable person would have waited for an opportunity that he *knew* was sufficient to clear the traffic lanes such that he could have yielded the right of way to imminently approaching westbound traffic on Broadway Street.

Gregory was not contributorily negligent.   Even having the right of way, Gregory had a duty to "keep a proper lookout, observe due care in approaching and crossing intersections and drive as a prudent person would to avoid a collision when danger is discovered or, by the exercise of reasonable care, should have been discovered."   *Salo*, 537 N.E.2d at 341.   However, Gregory did not breach these duties because he used due care in driving on Broadway Street at a reasonable speed, keeping watch for Davis as he crossed the street and applying his brakes as soon as he saw Davis would not be able to clear the intersection in time.   This satisfies the standard of ordinary care.

Injury:   As found above in the Findings of Fact, Gregory suffered whiplash and injured his head, neck and left shoulder/arm in the accident.   Residual muscular injuries from the whiplash are ongoing.   The cost of medical care for these injuries is $31,000.

Gregory had, and will continue to have, pain and suffering.   The amount that will fairly

compensate Gregory for his past pain and suffering is $30,000, and the amount that will fairly compensate Gregory for his future pain and suffering is $4,000.

No evidence of any other injury has been presented.

<u>Proximate Cause</u>:   Proximate cause is made up of (1) cause in fact and (2) legal cause. *First Springfield Bank & Trust v. Galman*, 720 N.E.2d 1068, 1072 (Ill. 1999).   If the negligence was "a material element and a substantial factor in bringing about the injury," then cause in fact is established.   *Palay v. United States*, 349 F.3d 418, 432 (7th Cir. 2003) (quoting *First Springfield Bank & Trust*, 720 N.E.2d at 1072).   Legal cause is established if the injury is foreseeable, that is, one that a reasonable person would view as the likely result of his conduct. *Id.*

As explained in the findings of fact, the accident caused injuries to Gregory's head, neck and left shoulder/arm that were apparent shortly after the accident.   Muscular whiplash injuries to Gregory's neck are chronic and will continue.   The accident did not cause or exacerbate later-emerging mid/lower back and leg problems, the shoulder pain he experienced beginning in or after February 2012, or any other injuries.

Gregory has satisfied the proximate cause element for the injuries discussed above as happening as a result of the accident; no other injuries have been proven as caused by the accident.   Davis's negligence was a material and substantial factor in causing the accident that resulted in Gregory's injuries, and the injuries to Gregory would have been foreseeable to a reasonable person in Davis's position driving a tractor-trailer rig into traffic from a private drive.

Because Gregory has established by a preponderance of the evidence that Davis was negligent and that his negligence proximately caused Gregory to be injured, and because Davis

has not proved by a preponderance of the evidence that Gregory was contributorily negligent, the Court finds in favor of Gregory and against Davis.    Additionally, because Davis was acting in the scope of his employment by Fedex, Fedex is vicariously liable under a *respondeat superior* theory.

IV.     **Conclusion**

For these reasons, the Court **DIRECTS** the Clerk of Court to enter judgment in favor of Gregory and jointly and severally against the defendants in the amount of $65,000.

**IT IS SO ORDERED.**
**DATED:    October 4, 2016**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**
